IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 1, 2022

**IN RE RALPH M. ET AL.**

**Appeal from the Juvenile Court for Knox County**
**No. 112656   Timothy E. Irwin, Judge**

_____

**No. E2021-01460-COA-R3-PT**
_____

This appeal arises from the termination of a mother's parental rights to her minor children upon the juvenile court's finding of the statutory grounds of abandonment by failure to provide a suitable home, substantial noncompliance with the permanency plan, persistent conditions, and failure to manifest an ability and willingness to assume custody of the children. The juvenile court further found that termination of the mother's parental rights was in the children's best interest. We vacate the statutory ground of persistent conditions due to insufficient findings of fact. However, we affirm the Juvenile Court's judgment in all other respects, including the termination of Mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed as Modified; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and KENNY W. ARMSTRONG, JJ., joined.

Mary Ward, Knoxville, Tennessee, for the appellant, Linda M.

Herbert H. Slatery, III, Attorney General and Reporter, and Erica M. Haber, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

# OPINION

## Background

Linda M. ("Mother") had two older children that were previously in DCS custody prior to the children in this action being born. Those children were removed from Mother's custody due to domestic violence and were subsequently adopted. The minor children, Ralph M. and Heavenlyfaith R. (collectively, "the Children"), were born to Mother in 2013 and 2014, respectively.[1] Following a domestic incident between Mother and her paramour, Scotty B., the Knox County Juvenile Court ("Juvenile Court") entered a restraining order restricting contact between the Children and Scotty B. on December 19, 2019; placed the Children with the Columbus Home Family Assessment Center for a family assessment on December 20, 2019; and ordered that the Children be placed into DCS custody on December 27, 2019. DCS filed a petition alleging the Children were dependent and neglected on December 27, 2019, due to their exposure to domestic violence. In October 2020, the Juvenile Court entered an order finding that that Children were dependent and neglected by clear and convincing evidence "due to mother's domestic violence issues."

DCS developed a family permanency plan in January 2020, which was subsequently ratified by the Juvenile Court. The permanency plan was updated in June 2020 and again in December 2020, each ratified by the Juvenile Court. During each hearing ratifying the permanency plans, the Juvenile Court found that the action steps on the permanency plan were reasonably related to remedying the conditions necessitating foster care and in the Children's best interest. This plan required Mother to: (1) complete a mental health assessment and follow all recommendations therefrom; (2) complete domestic violence education; (3) complete an alcohol and drug assessment and follow all recommendations therefrom; (4) submit to random drug screens; (5) complete parenting education; (6) obtain and maintain an appropriate home; (7) comply with all court orders; (8) pay child support; (9) maintain regular contact with DCS; (10) obtain a legal source of income; (11) maintain legal transportation; (12) be a law-abiding citizen; and (13) visit with the Children.

In November 2020, DCS filed a motion seeking to suspend Mother's visitation with Ralph, at the recommendation of Ralph's therapist, Dr. Angela M. Fuss, due to consistent signs of regression following visits with Mother. The Juvenile Court subsequently granted DCS's motion and ordered that all visitation with Mother and Ralph would be suspended. In April 2021, Heavenlyfaith's guardian *ad litem* also filed a motion in the Juvenile Court, requesting to suspend Mother's visitation with Heavenlyfaith due to the child's behaviors

---

[1] A guardianship order entered by the Juvenile Court reflects that Ralph's possible biological Father surrendered his parental rights to Ralph prior to trial and Ralph was placed in the partial guardianship of DCS. The Children's legal father and Heavenlyfaith's biological father's parental rights were terminated during this proceeding. Neither father's parental rights are at issue in this appeal.

that manifested in connection with her visits with Mother. This motion was also granted by the Juvenile Court.

DCS filed a petition to terminate Mother's parental rights in May 2021, alleging that (1) Mother had abandoned the Children by failing to provide a suitable home for them; (2) Mother had failed to substantially comply with the requirements of the permanency plans; (3) conditions had persisted that prevented the Children from being safely returned to Mother's custody; (4) Mother had failed to manifest an ability and willingness to assume custody of or financial responsibility for the Child; and (5) termination of Mother's parental rights was in the Children's best interest. The Juvenile Court conducted a trial in November 2021, during which the following witnesses testified: (1) Angela Fuss, Ph.D., Ralph's therapist; (2) Mother; (3) K. Shannon Wilson, Ph.D., a clinical psychologist; (4) Liz Cox, employee of Smoky Mountain Children's Home; (5) Edana Boney, DCS case manager; (6) Ralph's foster mother; and (7) Heavenlyfaith's foster mother.

Angela Fuss, Ph.D., was the first witness at trial. Dr. Fuss had been providing individual and family therapy for Ralph since August 2020. According to Dr. Fuss, Ralph spoke of a traumatic incident involving Scotty that had occurred while living with Mother, wherein Ralph's grandmother was injured. Ralph also mentioned that he also had been hurt while there. Ralph had been diagnosed with post-traumatic stress disorder (PTSD) resulting from incidents that occurred prior to his being placed into foster care. Ralph was exhibiting several behavioral issues when she began treating him, including being physically aggressive, defiant, and impulsive. Ralph also would have mood instabilities and dissociate at times. These behaviors had manifested at both home and school.

Ralph's visitation with Mother had been suspended since November 2020 as had been recommended by Dr. Fuss. According to Dr. Fuss, two incidents led to her recommendation to stop visits with Mother. The first occasion was during a video call between Mother and Ralph when Mother brought up Ralph's deceased infant sibling which triggered a substantial regression and behavioral issues for Ralph. Dr. Fuss testified that Ralph became more explosive, emotionally volatile, and irritable and that the incident had created a "manic phase" for him. The second incident occurred later when Mother had given gifts to Ralph that had caused regression for him. Although Dr. Fuss was not involved in these incidents personally, she had learned of the incidents and directly observed Ralph's behaviors after the incidents. After Mother's visitation was stopped, Ralph had fewer behavioral issues at both school and home. He was using his coping skills more regularly and "was more emotionally expressive versus reactive."

According to Dr. Fuss, Ralph had "improved tremendously" since she had been seeing him, and his physical aggression had decreased. Dr. Fuss stated that Ralph has trauma triggers that remain and cause "various meltdowns for him" but that it had become rare. Ralph was doing well academically, and the school had little issues with the Child's behavior anymore. Ralph was more stable at home, was thriving in his current

- 3 -

environment, and had bonded with his foster mother. Ralph had referred to his foster mother as his "forever mom," spoke of her with endearing terms, and expressed a fear that he would be removed from the foster mother's home. Dr. Fuss was concerned that Ralph's progress would be completely erased and that it could trigger a psychotic break for him should Ralph's relationship with foster mother be disrupted.

The Juvenile Court heard testimony from Mother. When asked during trial why the Children were placed into DCS custody, Mother stated that people were saying things that were not true, the Children believed what was said, and Mother had a black eye when DCS came to her home. Mother testified that she received the black eye from an altercation with Scotty during which the Children were not around and knew nothing about how she had gotten the black eye. She acknowledged that Scotty punched her in the face resulting in the black eye. Mother testified that the Children were never around any fights between her and Scotty. Mother denied that Ralph could have disclosed that he observed Scotty choking Mother because the Children were not around to see it. She further denied that Heavenlyfaith could have reported Scotty punching her in the face because Heavenlyfaith was not present. However, Mother verified that Scotty had choked her and hit her in the past.

Mother testified about her previous relationships. In at least three of Mother's relationships, the men were physically abusive to her and another was addicted to drugs. Mother testified of two other daughters to which she lost custody twelve years prior due to domestic violence allegations. According to Mother, she had broken her wrist twice, once as a teenager and once as an adult. She denied that her wrist was broken by Ralph's biological father. According to Mother, they were fighting, and she fell down the stairs, fracturing her wrist, because she was "extremely drunk."

According to Mother, she had not been in a relationship with anyone "since all this took place," and she had obtained a restraining order against Scotty. However, she acknowledged that she had been in a sexual relationship since that time with a man named Michael. When asked about a statement she made at a child and family team meeting in June 2020, Mother acknowledged that Michael had spent the night at her home and that she knew he was on probation; however, Mother stated that she "didn't know what he was on probation for." Mother explained that she did not have knowledge of the criminal charges that resulted in his probation, and it had not crossed her mind to inquire. She stated that when she found out he "had a charge on him," she had not spoken to him since. During trial, Mother was confronted with Facebook and TikTok posts from her account and from the account of a man named John, that appeared to show Mother in a relationship a few days before trial. She identified herself in photos and stated that she knew John, but she denied being in a relationship with him.

Mother also testified that her brother had been incarcerated in the past for attempted rape and fourth-degree stalking. She fought with her brother in February 2020. According

- 4 -

to Mother, she "beat the hell out of [her] brother because he was running his mouth." She further stated that she would not let a man hit her and get away with it. Mother testified that she no longer communicates with her brother.

Mother further testified that she had a history of marijuana and methamphetamine use, as well as "alcohol problems." According to Mother, she was a meth user three years prior. Mother testified that she had a drug issue while raising her children when her mother was living in her home, that she realized she had a problem, and that she sought help for the problem. Mother stated that she had relapsed with methamphetamine once and when she did, her cousin brought the methamphetamine to her at her home. She testified that she is no longer using methamphetamine.

Mother testified that she knew the requirements for her in the permanency plans. Mother testified that did not have a driver's license but had a bus pass for transportation. Mother completed the domestic violence class in May 2020 and parenting classes in July 2020. Mother testified that she is not required to pay child support because she has a disability. Mother explained that she has a learning disability but also acknowledged that she partially received disability benefits due to her mental health following the death of her infant child. Mother testified that she received almost $800 per month in SSI benefits due to her disability and $200 per month in food stamps. At the time of trial, Mother had a lease and was living in a three-bedroom apartment. According to Mother, her former DCS case manager came to the home and said the home appeared suitable, with enough room for the Children.

Mother testified that she had been attending therapy appointments once or twice a month. Mother previously had been diagnosed with borderline personality, a mood disorder, bipolar disorder, and anxiety disorder. According to Mother, she began with mental health treatment through Helen Ross McNabb in October 2020, but she was currently attending treatment at Cherokee Health since October 2021. Mother testified that she learned in individual therapy to be a better parent and better pick the people to be around her children. Mother's testimony is somewhat contradictory regarding whether she had taken her prescribed medication. She testified at trial that she was on prescribed medication. According to Mother, she had resumed taking her medication in 2020 and had not stopped taking it. When Mother was asked about a statement she made in May 2021 about being unmedicated since January 2021, she said "[n]ot that I know of" and that she had her medication information in her bag. She later clarified her statement about not taking medication since January 2021 and stated that she "was on medication, but the medicines that [she] was on [were] not helping." Mother also testified that she was not placed on medication until she went to Cherokee Health in October 2021.

Mother also participated in an alcohol and drug assessment and completed intensive outpatient treatment in April 2020. She said they recommended aftercare but it was not required. According to Mother, aftercare was not necessary "because [she] was also trying

- 5 -

to do three other classes in the time that [she] was trying to get [her] kids back as well." Mother felt like she did not need to attend aftercare with the provider because she was attending a drug class at a church. When asked whether she had refused to participate in a drug screen in February 2021, she stated that she had a mouth swab by another DCS worker and did not know she needed another one. DCS asked Mother about her response to the request via text message, in which she stated that she had just had a hair follicle drug screen in May 2020 and that she did not feel like she should have to get her hair cut for another test when it had been less than a year since the last test. She then asked the case manager for his supervisor's contact information. Mother acknowledged the text message and explained that she did not think DCS could request that she get her hair cut every three months. She spoke with the supervisor and stated that she ultimately did not attend the drug screen as requested because she did not have transportation.

Mother acknowledged that she subsequently failed a hair follicle drug screen for methamphetamine in April 2021. According to Mother, she snorted methamphetamine one time while her children were in foster care, and she reached out for help concerning that issue. Following the positive drug test, Mother acknowledged that she was required to get additional drug treatment. According to Mother, she initially attended three classes at Health Connect, but she quit going because other attendees were bragging about their drugs. She transferred to Cherokee Health where she had taken three more classes. The classes at Cherokee Health were conducted via Zoom, and Mother testified that her Zoom began "acting up" on her phone. She stated that she was working with Cherokee Health to find "something more suitable for a drug program" and that they are trying to find an in-person class for her to attend. According to Mother, she had stayed clean after the failed drug test and her failure to appear for another, and she had contacted DCS for a drug screen but was denied. She stated that she had contacted DCS within the past month, but her case worker had not responded to her when she asked if she could go somewhere else for intensive outpatient treatment.

Mother testified that she had not seen Ralph in over a year and had not seen Heavenlyfaith in a few months due to motions filed to restrict her visitation. Due to Covid-19, Mother's visits occurred via Zoom but they eventually went back to in-person visits. According to Mother, her relationship with Heavenlyfaith was great during visits, and Heavenlyfaith kept asking when she could return home. Mother testified that there were issues with her visits with Ralph because they were via Zoom and were interrupted by the foster mother. According to Mother, Ralph would not sit for the full hour for the video visits due to his issues so she would let them end early so as not to overwhelm him.

Shortly before trial, Mother's DCS case manager came to conduct an unannounced home visit, but Mother testified that she was at the hospital with her grandfather. The case manager asked Mother to submit to a drug screen the following day, but Mother testified that she was at the hospital all day that next day as well and was unable to get transportation.

K. Shannon Wilson, Ph.D., testified as an expert in the field of psychology. Dr. Wilson testified that she possessed a Ph.D. in clinical psychology since 2001 and had been providing psychological assessments for clients since that time. She performed a psychological evaluation on Mother and met with Mother twice in September and November 2020. She observed Mother's right hand in a cast at one point during the assessment, and Mother told her it was the fifth time she had broken that hand. Mother explained to her that she had broken her hand while she was moving because her shoe had been untied. Mother reported to Dr. Wilson that she had been in abusive relationships in the past. Mother further stated to her that she had gotten an order of protection against her husband in March 2020 and that he had used drugs and been physically abusive toward her. According to Mother's statements to Dr. Wilson, the Children spoke about an incident at school and DCS was contacted. Mother told Dr. Wilson that she had tested positive for marijuana at the time and had lied about her bruises. Mother reported using methamphetamine in 2018 and that she had relapsed at the age of 30, using marijuana, pain pills, and methamphetamine.

Following an assessment of Mother, Dr. Wilson concluded that Mother met the criteria for a diagnosis of unspecified personality disorder with paranoid and dependent features, polysubstance dependence, and complicated bereavement. Mother also had a history of being diagnosed with bipolar disorder. Dr. Wilson explained as follows:

> So the overall conclusions were that she meets criteria for a diagnosis of unspecified personality disorder with paranoid and dependent features.
>
> The paranoid is fairly self-explanatory. That's just the belief that people are out to get her or genuinely have ill will toward her. She's likely to be suspicious and distrustful of others.
>
> The dependent feature is also kind of what it sounds like. She tends to rely more heavily on others than is typical for someone her age. She may have trouble making decisions by herself and may feel like she's not capable of functioning effectively on her own. Those dependent features are probably one of the reasons that she has a tendency to stay in abusive relationships, because she doesn't necessarily have the confidence in her ability to make it on her own.
>
> She also met criteria for polysubstance dependence, which is just the inappropriate use of more than one drug. She said that it was in remission at that point, which means she hadn't used for a period of time prior to the evaluation. But, again, that was just her report. I didn't actually do any drug testing with her.

The complicated bereavement is a diagnosis that basically talks about the fact that she was experiencing bereavement related to the loss of her baby, but that it was not a typical bereavement, and that it was resulting in some different and maladaptive kind of symptoms and behaviors for her.

And then the bipolar disorder was by history. There wasn't a whole lot of evidence in this evaluation of bipolar disorder, but she said that she had been diagnosed with that in the past. And her history of drug use is not uncommon with bipolar disorder. So the by history note there means that wasn't necessarily something that was present in this evaluation, but it was a previous diagnosis that kind of makes sense.

So the recommendations based on all of that were that she participate in individual therapy to help her develop some more effective ways of coping with the unpleasant emotions that she has. Obviously, the -- the grief and bereavement about the loss of her child. Also, the different factors that play into her relationship choices needed to be addressed. And she needs to develop an understanding of how she has contributed to the current situation.

There seemed to be a lot of assigning of blame elsewhere during the evaluation. And she really didn't seem to understand how her behavior and her issues were having a negative impact on her kids.

So I made a note that it would be real important for her treatment providers to make sure that information was presented to her in a way that she could understand it, based on her level of intellectual functioning, and, again, appropriately processing the grief regarding her baby.

And the overall conclusion was that at this time, [Mother] was still just making profoundly bad relationship decisions that put not only her children but herself in jeopardy. And when she did recognize that the relationships were unhealthy, she didn't take steps to fix it.

And the ongoing drug use, repeated involvement in domestic violence relationships, and, you know, really the -- the lack of her ability to see how she was contributing to the problem really put her in a place where she was not capable of parenting her children appropriately.

The psychological evaluation was admitted into evidence during trial. Dr. Wilson opined that based on her interactions with Mother in 2020, she did not believe Mother would be able to parent the Children safely in the near future. Dr. Wilson acknowledged that it was possible Mother could be addressing her concerns since they last met in November 2020. However, seeing a therapist once a month since October 2021 was not the extensive therapy

that she would look to in order to reflect change. Dr. Wilson testified that as part of the complicated bereavement, creating fantasies of nonexistent children can be a coping mechanism but is very unhealthy.

Liz Cox, the Children's case manager with Smoky Mountain Children's Home, also testified during trial. Ms. Cox had been involved with the Children's case since January 2020. She supervised Mother's visits with the Children. She had spoken with Mother regarding the expectations of her during visitation and when something inappropriate happened during visits, she attempted to redirect Mother. Ms. Cox explained that most of the time, Mother had not reacted appropriately to the redirection and that she had not taken what she learned from the visits to improve subsequent visits, at least not while Ms. Cox was supervising the visits. At some point, it became necessary to separate the Children into two separate foster homes due to behavioral issues. When the Children were placed together in the same home, they would have visits with Mother together, but when they were placed in separate homes, they had visits with Mother separately.

Prior to Mother's visitation with Ralph being suspended, Ralph displayed some violent tendencies during face-to-face visits and some behaviors after the visits. During the Covid-19 pandemic, they had video visits between Mother and Ralph, and Mother made some negative and unkind statements in front of Ralph regarding the clothing he was wearing or his body. When asked specifically what Mother had said about Ralph's body, Ms. Cox testified that she had made comments about Ralph's weight, calling him "her chunky monkey." Following the negative statements made by Mother, the Child's body language changed and he lowered himself down, put his head on the table, or became frustrated and stated that he was ready to leave. According to Ms. Cox, Ralph would not have a whole visit with Mother most of the time. During one visit, Mother made statements in front of Ralph regarding the infant sibling that had died. Following the visits with Mother, Ralph had behavioral issues at school or with the foster parents. Even though Ralph's behaviors continued after Mother's visits were suspended, they had improved significantly.

She also supervised Mother's visits with Heavenlyfaith. During visits, Heavenlyfaith appeared to spend more time with the grandmother. When Ms. Cox was supervising the visits, there were a couple of times when she had to end the visits early. Mother would say inappropriate things during visits, such as comments about Heavenlyfaith coming home, speaking negatively about DCS workers or the Department generally, and making negative comments about Heavenlyfaith's clothing. A visit was ended early on one occasion due to these comments by Mother. On another visit in September 2021, Mother had brought something from home she was asked not to bring. It was an item for Heavenlyfaith to take with her, but Ms. Cox informed her that Heavenlyfaith could not take it. Mother had become argumentative, was angry, got close to Ms. Cox's face, and was raising her voice. Mother was informed that if she did not stop, the visit would end. When Mother's actions did not stop, the visit ended.

She often transported Heavenlyfaith after the visits with Mother. During transportation after visits, she observed unregulated behaviors with Heavenlyfaith. She displayed signs of anxiety, became fidgety and unable to sit still, asked repeated questions, or asked Ms. Cox to say something over and over again. The last time the visit was ended early, Heavenlyfaith apologized about what had happened with Mother. Ms. Cox testified that she spent a lot of time with Heavenlyfaith and explained that she knew when her character changed. At the time of trial, Mother had no visits with either of the Children.

The Juvenile Court heard testimony from Edana Boney, the Children's DCS case worker since September 2021. Ms. Boney testified that she personally observed Mother be aggressive during an in-person child and family team meeting in October 2021, during which Mother become very frustrated and responded to each question she asked her with "Check your file" or "I've already told you all that." According to Ms. Boney, Mother referred to the guardians with vulgar language and referred to the Children as her "GD children." During the meeting, one of the concerns was Mother's drug use and how it had not been resolved. Mother responded aggressively, stating that her failing for methamphetamine meant nothing and referring to the individuals present in derogatory language. According to Ms. Boney, Mother disclosed during that meeting that she had used a lot of methamphetamine when she had custody of the Children, much more than she had used recently. When they asked Mother to have another alcohol and drug assessment, she did not take it well and had outbursts regarding her dislike of lawyers and anyone with a badge. Ms. Boney testified that during the meeting, Mother refused to provide information regarding her mental health. She denied that Mother had asked for assistance with her drug treatment providers during the meeting. Ms. Boney testified that Mother subsequently reached out to her on November 1, 2021, asking Ms. Boney for her action steps on the updated permanency plan.

Ms. Boney had attempted to get Mother to sign a release for Cherokee Health the week before trial. Although Mother had signed a release with DCS, Cherokee Health required a separate release be signed with their program before they would release records. Ms. Boney testified that she went by Mother's home shortly before trial for an unannounced home visit. Mother had previously told her that she needed to schedule the home visits four or five days in advance, but Ms. Boney wanted to do an unannounced visit, take Mother a bus pass, and give her a drug screen. Mother was not home on that day, but she spoke with Mother via telephone. During their conversation, Mother was upset that she was at her home without notice and informed her that she was with her grandfather. When Ms. Boney told her that she needed to do a drug screen, Mother stated that she would have the maternal grandmother bring her by the next day for a drug screen. Ms. Boney testified that Mother informed her that she was on her menstrual cycle and it was extremely heavy, and Ms. Boney replied that it was okay. According to Ms. Boney, Mother became very frustrated and stated: "I'm not trying to tell you I'm not going to take it; I'm just letting you know, you know." Ms. Boney informed her that it was "fine."

Mother told her that the maternal grandmother had a doctor's appointment at 1:00 p.m. the next day, and Ms. Boney told her that would work out perfect because she had court at 1:30 p.m. Mother told her that she would be there the next morning; however, Ms. Boney did not hear from Mother the next day.

Ms. Boney testified that Heavenlyfaith is living with a single foster mother and has her own bedroom. She appears to be very comfortable and energetic. According to Ms. Boney, Heavenlyfaith's foster mother is firm with her, which is necessary, and they appear to be bonded with each other. Heavenlyfaith was in therapy at the time of trial and was doing well. Ms. Boney further testified that Ralph is placed with a separate foster mother, with no other individuals living in the home, and has his own bedroom. According to Ms. Boney, Ralph is still in therapy and is doing well in the foster home.

Ralph's foster mother testified during trial. Ralph had been living with her for twenty-one months by the time of trial. Ralph lives in the home with his foster mother and a 15-year-old beagle. Ralph's foster mother testified that Ralph came to her with behavioral issues. Ralph had issues with food insecurity, stealing, lying, impulsivity, and disobedience in school. Ralph was having complete blackouts and woke up screaming, "No, no, no, don't hurt me." Ralph's foster mother testified that Ralph had disclosed trauma and abuse he experienced while living with Mother. She stated that Ralph told her that he had walked in on Mother being strangled with a belt by Scotty and that Scotty had beat him with a stick. Ralph also stated that Mother had served him a clear liquid that came out of a bottle with a pineapple on it and that this liquid had made him sleepy.

When Ralph was visiting with Mother, his behavior was sometimes different. When Mother had presented him with gifts during the visits, his behavior was consistently difficult for a few days. Ralph was destructive and would break the toys. Mother brought items that had to be thrown out, much of that was food to which Ralph was allergic, as well as clothing smelling of smoke or caked in mud or feces. According to Ralph's foster mother, sometimes the clothing she brought was girls' clothing.

Ralph's foster mother testified that Ralph's final visit with Mother had gotten out of hand and traumatized him. In October 2020, during a video call, Mother began discussing the deceased sister's birthday, and Ralph got upset and began crying and screaming. According to Ralph's foster mother, they had days of him hiding under desks and having accidents at night. She stated that he had also tried hurting himself. When asked what she meant by Ralph hurting himself, she explained that when Ralph gets angry, he gets frustrated and scrapes his fingernails against his face and down to his neck and that he bangs his head on the floor or another surface.

To address his trauma, Ralph had been seeing Dr. Fuss and had completed rounds of therapy at Camelot, which had helped. He attends appointments with Peninsula and is prescribed medication. Additionally, he had an appointment at Vanderbilt for a full

evaluation. Ralph's foster mother met with the counselor at Ralph's school regularly to address strategies to use at home and at school. She left her full-time job and accepted a job with better hours that would allow her to take Ralph to school and be available for his after-school appointments.

Ralph's foster mother testified that Ralph is doing very well in school and now loves school. He is struggling to learn to read but is receiving tutoring twice a week. His teachers are proud of his progress. Behaviorally, Ralph has had ups and downs, but she stated that his behavior and anger had improved. Ralph is now proud of himself and has self-confidence. Ralph's foster mother testified that Ralph tries hard to do the right thing and is funny and happy. She loves Ralph, would do anything for him, and would like to adopt Ralph if he is available for adoption.

Heavenlyfaith's foster mother also testified during trial. Heavenlyfaith had been living with her for thirteen months at the time of trial. Heavenlyfaith lives in the home with foster mother and a dog. Heavenlyfaith sees Leanne Goldstein, a mental health professional, once a week; attends appointments at Peninsula; and is prescribed medication. Heavenlyfaith was having behavioral issues when she first came to live with her, including day-to-day behaviors and escalated behaviors after she visited with Mother. Heavenlyfaith's foster mother testified that following visits, Heavenlyfaith became destructive with items that Mother had given her, intentionally tearing up pictures and destroying toys. She also would urinate in her bed the night after the visits. She became defiant, argumentative, and tried to control the situations. Heavenlyfaith's foster mother testified that following the visits, Heavenlyfaith also had behavioral issues in school that caused her grades to suffer. On one occasion, Heavenlyfaith had peed in a trash can at school. The visits had affected Heavenlyfaith to such a degree that the visits were moved from Wednesdays to Fridays so that her schooling would not suffer.

Heavenlyfaith told her foster mother that she did not feel safe when living with Mother, describing a lot of chaos, yelling, and screaming. Heavenlyfaith told her that there were many men in and out of Mother's life. She spoke specifically of CT and Scotty, who were very mean to her. Heavenlyfaith's foster mother testified that the Children are in separate foster homes because they are trauma bonded, which she explained means that they had gone through so much trauma together, they were unable to live in the same home together. The Children are not having visitation with each other, but Dr. Fuss and Leanne Goldstein had been communicating regarding when would be an appropriate time for the Children to begin communication. Heavenlyfaith's foster mother testified that she would like to adopt Heavenlyfaith if she were to be available for adoption. If she adopts Heavenlyfaith, she would consider allowing the Children to visit each other if the mental health professionals believe it would be in the Children's best interest.

Following trial, the Juvenile Court entered an order granting DCS's petition to terminate Mother's parental rights. The Juvenile Court found much of Mother's testimony during trial not to be credible, stating as follows in pertinent part:

> The mother's testimony is not credible and this may be due to her mental health or it could just be her lack of truthfulness. Numerous internet sites were discussed where the mother said she was having twins and was attempting to raise money to help support the twins. The mother denied posting such things. Her actions regarding nonexistent children may be a form of a bereavement disorder since the mother had a child pass away. However, during testimony, it does appear that the mother was lying at times or maybe she believed her own lies hence why the Court could not consider her testimony credible.

In contrast, the Juvenile Court found credible the testimonies of Dr. Fuss, Dr. Wilson, Ms. Cox, Ms. Boney, and the Children's foster parents. The Juvenile Court found that DCS had proven the following grounds for termination of Mother's parental rights: (1) abandonment by failure to provide a suitable home for the Children; (2) substantial noncompliance with the permanency plans; (3) persistent conditions; and (4) failure to manifest an ability to parent the Children. Additionally, the Juvenile Court considered the relevant statutory factors at Tenn. Code Ann. § 36-1-113(i) and found that termination of Mother's parental rights was in the Children's best interest. Mother timely appealed.

## Discussion

Although not stated exactly as such, Mother raises the following issues for our review on appeal: (1) whether the Juvenile Court erred in finding by clear and convincing evidence that Mother abandoned the Children by failing to provide a suitable home; (2) whether the Juvenile Court erred in finding by clear and convincing evidence that Mother was not in substantial compliance with the permanency plans; (3) whether the Juvenile Court erred in finding by clear and convincing evidence that the conditions which led to the removal of the Children from Mother's home still persisted; (4) whether the Juvenile Court erred in finding by clear and convincing evidence that Mother failed to manifest an ability and willingness to assume custody of the Children; and (5) whether the evidence presented at trial supports a finding by clear and convincing evidence that termination of Mother's parental rights is in the best interest of the Children.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by

the Due Process Clauses of the federal and state constitutions.[2]  *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993).  But parental rights, although fundamental and constitutionally protected, are not absolute.  *In re Angela E.*, 303 S.W.3d at 250.  "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .'  Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child."  *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.  "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it."  *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388.  "Few consequences of judicial action are so grave as the severance of natural family ties."  *Id.*  at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996).  The parental rights at stake are "far more precious than any property right."  *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388.  Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child."  Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable").  In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings.  *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence.  *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388.  This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights.  *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).  "Clear and convincing evidence enables the fact-finder to

---

[2] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . .").  Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[3] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[4] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

---

[3] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[4] Tenn. Code Ann. § 36-1-113(i).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In combination with a best interest finding, clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Additionally, the Juvenile Court is the arbiter of witness credibility of those who testify live before it. As our Supreme Court has instructed:

> When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *see also Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). In order for evidence to be clear and convincing, it must eliminate any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 221 (Tenn. 2009)). Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness. *Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 515 (Tenn. 2013), (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)), *cert. denied*, ⸺ U.S. ⸺, 134 S.Ct. 224, 187 L.Ed.2d 167 (2013).

*Kelly v. Kelly*, 445 S.W.3d 685, 692-93 (Tenn. 2014).

We first address Mother's issue concerning whether the Juvenile Court erred in finding by clear and convincing evidence that Mother abandoned the Children by failing to provide a suitable home. Tenn. Code Ann. § 36-1-113(g)(1) (2021) provides abandonment as a statutory ground for the termination of a parent's parental rights. Tenn. Code Ann. § 36-1-102(1)(A)(ii) (2021) defines abandonment in relevant part as follows:

> (a) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

> (b) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing

agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(c) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

The record reflects that the Children were removed from Mother's custody in December 2019, as reflected in the Juvenile Court records from the dependency and neglect proceedings. DCS had filed a petition with the Juvenile Court alleging the Children were dependent and neglected in the care of Mother. In the order placing the Children in DCS custody, the Juvenile Court found that DCS had made reasonable efforts to prevent removal of the Children from the home. Subsequently, the Juvenile Court found the Children to be dependent and neglected by clear and convincing evidence due in part to Mother's issues with domestic violence in her home.

The Juvenile Court found that DCS had made reasonable efforts to assist Mother during the four months following the removal. In her brief, Mother argues that the record lacks evidence demonstrating what efforts DCS had made to assist Mother in establishing a home. In its written order, the Juvenile Court found that during the four-month period from December 27, 2019 through April 27, 2020, DCS made reasonable efforts to assist Mother in providing a suitable home for the Children by providing Mother with an alcohol and drug assessment, a mental health assessment, visitation, and bus passes, as well as providing for the basic needs of the Children during this time. DCS had developed a permanency plan in January 2020 that including goals and responsibilities for Mother. An order entered during the dependency and neglect action concerning a hearing occurring in March and July 2021 supports the Juvenile Court's finding that DCS had been assisting the parents with a mental health assessment, mental health counseling, a psychological evaluation, visitation with the Children, an alcohol and drug assessment, alcohol and drug treatment, drug screening, basic parenting instruction, domestic violence treatment, anger management treatment, and child support services. In that court order, the Juvenile Court found that DCS had been making reasonable efforts to achieve permanency for the

Children in part by ensuring that the parents have access to all of the treatment and services that are required by the permanency plan.

Additionally, Ms. Cox testified that she had been a case manager for the Children since January 2020 and had supervised visits between Mother and the Children. Mother testified that she was receiving visitation with the Children via Zoom beginning in March 2020. Mother testified that she attended parenting classes in early 2020 and completed an intensive outpatient drug treatment program in April 2020; those services were clearly offered to Mother during the relevant four-month period. The evidence in the record supports the Juvenile Court's finding that DCS had provided reasonable efforts to assist Mother.

Additionally, Mother argues on appeal that the Juvenile Court erred by finding that she had not made efforts to provide a suitable home for the Children. According to Mother, "[t]he record clearly reflects that the mother obtained and maintained a home suitable in size for her and the children." Mother further argues that no evidence was presented to demonstrate that Mother had continued to engage in domestic violence relationships after the Children were removed from her custody.

We agree that Mother had obtained a suitable physical space for the Children to reside should they return to her custody. However, providing a suitable home requires more than having a sufficient physical space where the Children can reside. *See In re A.D.A.*, 84 S.W.3d 592, 599 (Tenn. Ct. App. 2002). A parent must provide a home suitable for the children that is free from illegal drug use and domestic violence. *See In re Navada N.*, 498 S.W.3d 579, 595 (Tenn. Ct. App. 2016); *In re Diamond F.*, No. M2020-01637-COA-R3-PT, 2022 WL 905791, at *6 (Tenn. Ct. App. Mar. 29, 2022).

In addition to acquiring a physical space, Mother made some initial efforts by completing assessments that were required of her and some recommended treatment. However, the Juvenile Court found that Mother had failed to provide a safe home for the Children. At the time of the Children's removal into DCS custody, Mother lied about the origin of the black eye she had received and later told her therapist that she had lied about how she received the injury. At trial, she admitted that the black eye was a result of an altercation with Scotty. Mother continued to lie in her testimony at trial about certain domestic violence. The Juvenile Court found that Mother had downplayed domestic violence incidents for years and that she lied about one paramour breaking her wrist, testifying during trial that she obtained the broken wrist from falling down the stairs due to alcoholism. Although both Children disclosed observing domestic violence occurring toward Mother, Mother continues to maintain that the Children were not present for any domestic violence.

The Juvenile Court found that despite Mother attending domestic violence education, she had not learned how to maintain healthy relationships with no physical

violence. Mother even admitted during trial that she had gotten into a fight with her brother in February 2020 because he was "running his mouth." Although Mother testified that she had remained single since the Children were placed in foster care, the Juvenile Court found that Mother had been in a relationship with a man who was on probation for one count of aggravated stalking and three counts of domestic violence. The evidence presented supports the Juvenile Court's finding by clear and convincing evidence that Mother had not provided a suitable home that is safe for the Children. We, therefore, affirm this ground for the termination of Mother's parental rights.

We next address whether the Juvenile Court erred by finding the ground of substantial noncompliance with the permanency plans against Mother. Concerning substantial noncompliance with the permanency plans, Tenn. Code Ann. § 36-1-113(g)(2) (2021) provides:

> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4;

The Juvenile Court found that the permanency plan requirements were reasonably related to the reasons for removal. Throughout the time the Children were in DCS custody, the court-approved permanency plans required Mother to: (1) complete a mental health assessment and follow all recommendations therefrom; (2) complete domestic violence education; (3) complete an alcohol and drug assessment and follow all recommendations therefrom; (4) submit to random drug screens; (5) complete parenting education; (6) obtain and maintain an appropriate home; (7) comply with all court orders; (8) pay child support; (9) maintain regular contact with DCS; (10) obtain a legal source of income; (11) maintain legal transportation; (12) be a law-abiding citizen; and (13) visit with the Children.

Regarding the ground of substantial noncompliance with the permanency plan, we must determine a parent's compliance in light of the permanency plan's goals. *See In re Alexis S.*, No. M2018-00296-COA-R3-PT, 2018 WL 6267180, at *8 (Tenn. Ct. App. Nov. 30, 2018). As this Court has stated:

> As we see it, the compliance required with a permanency plan is that which is necessary to overcome the reasons that children are removed from a parent and placed in foster care. Regaining custody requires parents to complete certain tasks and maintain compliance with the plan to the point that it is appropriate and safe to return the children to them. In our view, a permanency plan is not simply a list of tasks with boxes to be checked off before custody is automatically restored. Rather, it is an outline for doing the things that are necessary to achieve the goal of permanency in children's lives.

*In re V.L.J.*, No. E2013-02815-COA-R3-PT, 2014 WL 7418250, at *8 (Tenn. Ct. App. Dec. 30, 2014). We agree that substantial compliance with the requirements of a permanency plan is more than merely checking boxes on a list of action steps; a parent must complete his or her responsibilities in such a way as to demonstrate that they are able and willing to care for the children long-term. *See id.*

In the present case, Mother initially demonstrated some compliance with the permanency plan, but the Juvenile Court found that it had not risen to the level of substantial compliance. She completed a mental health assessment, an alcohol and drug assessment, domestic violence education, and parenting education. Additionally, Mother maintained a legal source of income and a physical home with sufficient room for the Children. However, although Mother had completed her parenting education classes and attended visits with the Children, she had not applied what she was taught in her parenting classes during visits with the Children. The Juvenile Court found that during her visitation, Mother had antagonized the Children who were already damaged due to the trauma they had endured.

Although completing a mental health assessment, Mother has not continued consistently with her individual therapy appointments as recommended by her assessment. Mother testified that she had attended therapy at Helen Ross McNabb beginning in October 2020. The Juvenile Court found that Mother had been prescribed medication but that she had informed DCS during a child and family team meeting in May 2021 that she had not been on her medication since January 2021. Mother testified that she had transferred her individual therapy in October 2021 to Cherokee Health and had attended eleven sessions. However, the Juvenile Court found that Mother's testimony was not credible. No evidence other than Mother's testimony was admitted into evidence to reflect that Mother had been participating in individual therapy at the time of trial.

Although Mother initially completed intensive outpatient drug treatment, she subsequently used drugs and tested positive for methamphetamine in April 2021. Mother also had failed to comply with two drug screens that were requested of her. Since the positive drug screen, Mother was to complete an intensive outpatient program again. However, Mother had completed only a total of six classes at two separate programs. Mother made excuses during trial as to why she had not maintained consistent attendance with the intensive outpatient treatment program, including her allegations that attendees of the classes at Health Connect were bragging of their drug use and after transferring programs, her problems with Zoom while attending the virtual classes at Cherokee Health. The Juvenile Court did not find Mother's testimony in this regard to be credible and found that Mother was not actively involved with any substance abuse treatment providers at the time of trial. We find no evidence bringing any of the Trial Court's credibility determinations even into question. The evidence in the record supports the Juvenile Court's findings by clear and convincing evidence that Mother had not substantially

complied with the requirements in her permanency plans. As such, we affirm this ground for the termination of Mother's parental rights.

We next address whether the Juvenile Court erred by finding the ground of persistent conditions against Mother. As to persistence of conditions, Tenn. Code Ann. § 36-1-113(g)(3) (2021) provides as follows:

> (A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> > (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
> >
> > (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
> >
> > (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
>
> (B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Mother argues on appeal that the Juvenile Court erred by finding that persistent conditions existed at the time of trial. In its judgment, the Juvenile Court made several findings as relevant to this statutory ground, including that the Children had been removed from Mother's home for the required period of six months in a dependency and neglect proceeding, that the conditions that led to the Children's removal from Mother continued to persist, and that there was little likelihood that those conditions would be remedied to allow the Children to return home. Although Mother does not raise insufficient findings of fact regarding this ground as a basis for error by the Juvenile Court, we have been instructed by our Supreme Court "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination . . . , regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525-26 (footnote omitted). In this case, the Juvenile Court failed to address Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii) and make specific findings of fact regarding whether the continuation of the parent/child relationship between

Mother and the Child would greatly diminish the Child's chances of early integration into a safe, stable, and permanent home.

This Court has vacated the ground of persistent conditions for the same reason before. In that case, this Court stated as follows:

> While the Juvenile Court's order in this case contains limited findings responsive to this ground, notably, it contains no findings relative to (g)(3)(A)(iii) concerning whether "[t]he continuation of the parent ... and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home." Being an element of the statutory ground, it is a factor that must be established and found. Indeed, "[t]he absence of appropriate findings supporting this ground for termination is not a trivial concern." *In re Mickeal Z.*, No. E2018-01069-COA-R3-PT, 2019 WL 337038, at *13 (Tenn. Ct. App. Jan. 25, 2019). In termination cases, "the trial court is specifically directed by statute to 'enter an order that makes specific findings of fact and conclusions of law.'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(k)). Because the Juvenile Court did not make findings regarding each of the elements applicable to the persistence of conditions ground, we hereby vacate the termination order with respect to this ground.

*In re Dominic B.*, No. E2020-01102-COA-R3-PT, 2021 WL 774185, at *8 (Tenn. Ct. App. Mar. 1, 2021); *see also In re Daniel G.*, No. E2021-00188-COA-R3-PT, 2021 WL 5297698, at *15 (Tenn. Ct. App. Nov. 15, 2021). We vacate the ground of persistent conditions as a ground for termination of Mother's parental rights due to insufficient findings of fact concerning Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii) as required by Tenn. Code Ann. § 36-1-113(k). Determining that other grounds exist in this case to support the termination of Mother's parental rights to the Children, it is not necessary to remand to the Juvenile Court for additional findings.

We next address whether the Juvenile Court erred in finding by clear and convincing evidence the ground of failure to manifest an ability and willingness to assume custody of the Children as to Mother. Tenn. Code Ann. § 36-1-113(g)(14) (2021) provides as follows as a ground for termination:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

This ground has two prongs. Regarding the first prong of our analysis, our Supreme Court has explained that "[i]f a person seeking to terminate parental rights proves by clear

- 23 -

and convincing proof that a parent or guardian has failed to manifest <u>either</u> ability or willingness, then the first prong of the statute is satisfied." *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020) (emphasis in original). The second prong of the statute requires the court to consider whether placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. *See* Tenn. Code Ann. § 36-1-113(g)(14) (2021).

With regard to the first prong of this ground, a parent's actions or inaction can be analyzed by the trial court in its determination of whether the parent has established a lack of willingness to assume custody of or financial responsibility for the Child. *See In re Ryan J. H.*, No. M2019-01439-COA-R3-PT, 2020 WL 7861376, at *14 (Tenn. Ct. App. Dec. 22, 2020), *no perm. app. filed*, ("[The parent's] actions in the present case raise doubts as to his actual willingness to assume custody of the Child."); *In re Ellie K.*, No. M2019-01269-COA-R3-PT, 2020 WL 1943522, at *11 (Tenn. Ct. App. Apr. 23, 2020), *no perm. app. filed*, ("It is well established that a parent's actions can demonstrate a lack of willingness to assume custody of or financial responsibility for the child.").

The Juvenile Court found that Mother continued to have substance abuse issues, as is demonstrated by her positive drug screen for methamphetamine approximately a month before the filing of the termination petition; mental health issues, to which she had not consistently attended the recommended therapy; domestic violence issues, which have continued due to Mother's relationship with a man on probation for aggravated stalking and domestic assault; and an unstable home environment. Additionally, Mother has had no contact with her Children due to her actions during visits and the Children's behavioral issues stemming from contact with Mother. Although Mother had made some effort to complete the requirements on her permanency plans, she had not, as shown by her actions, demonstrated an ability and willingness to assume custody of the Children. We agree with the Juvenile Court that clear and convincing evidence was presented by DCS to establish that Mother had failed to manifest an ability and willingness to assume custody of the Children, as required by Tenn. Code Ann. § 36-1-113(g)(14).

By the same quantum of proof, DCS has proven the second prong in establishing that returning the Children to Mother's custody would pose a risk of substantial harm to the Children's physical or psychological welfare. In addition to Mother's continuing issues with drug use, domestic violence, and mental health, the Juvenile Court recognized that the Children were "extremely traumatized" due to the violence they have witnessed while residing with Mother. After they were placed into DCS custody, the Children had to be placed in separate homes because they were trauma bonded. The Children had such behavioral issues stemming from their visits with Mother that their visits were stopped. Once the visitation stopped, the Children's behaviors improved. The Juvenile Court found that returning the Children to Mother's custody would pose a risk of substantial harm to the physical and/or psychological welfare of the Children. We hold that the evidence supports the Juvenile Court's finding in this regard by clear and convincing evidence.

Therefore, we affirm the Juvenile Court's finding of this ground for the termination of Mother's parental rights.

Finally, having determined that grounds exist for the termination of Mother's parental rights, we next address her argument concerning the best interest analysis. Tenn. Code Ann. § 36-1-113(i)(1) provides a set of non-exclusive factors courts are to consider in determining whether termination of parental rights is in a child's best interest:

 (A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there

- 25 -

is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(1) (2021). A trial court shall consider all relevant and child-centered factors that are applicable to the particular case, and expert testimony is not required to prove or disprove any factor. *Id.* § 36-1-113(i)(1) and (4). All applicable factors must be identified by the trial court and supported by specific findings of fact in the trial court's written judgment. *Id.* § 36-1-113(i)(3). Statutory authority for the best interest factors further provides a presumption that "the prompt and permanent placement of the child in a safe environment" would be in the child's best interest. *Id.* § 36-1-113(i)(2).

This Court recently compared the newly-enacted best interest factors to the previous best interest factors and concluded that the old factors were included within the new factors. *See In re Da'Moni J.*, No. E2021-00477-COA-R3-PT, 2022 WL 214712, at *23 (Tenn. Ct. App. Jan. 25, 2022), *perm. app. denied* (Tenn. Apr. 1, 2022). Similar to the old factors, the newly-enacted best interest factors are "illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). We believe the following guidance provided by our Supreme Court concerning the previous statute would also be applicable to the newly-enacted factors:

> Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives

- 27 -

individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523.

*In re Gabriella D.*, 531 S.W.3d at 681-82 (Tenn. 2017). "In all cases, when the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2021).

In making its decision, the Juvenile Court identified the applicable statutory best interest factors to the present action and included findings of fact regarding those factors in its written order. The Juvenile Court found that the combined best interest factors weighted in favor of terminating Mother's parental rights. Mother had not remedied her issues that had caused her Children to be removed from her custody despite reasonable efforts provided by DCS. Mother continued to have unresolved substance abuse and mental health issues, as well as her participation in unhealthy relationships. Although Mother had completed her assessments and some treatment, she had not consistently attended the recommended mental health therapy, had not reliably taken her medication that was prescribed to her, had used illegal drugs shortly before the termination action was filed, and had entered into a relationship with a man who has a history of stalking and domestic violence. After Mother tested positive for methamphetamine in April 2021, she had not completed her second intensive outpatient treatment program but had given unpersuasive excuses during trial as to why she had not consistently attended the program. As of the time of trial, Mother was not actively participating in a drug treatment program.

Mother had not made a lasting change such that it would be safe or beneficial for the Children to be returned to her care, and in fact, the Juvenile Court found that Mother's conduct remained the same and her conditions were very similar to when the Children were removed from her care. Although Mother had a physical space sufficient for the Children to reside, the Juvenile Court found that Mother's home was not safe and healthy for the Children due to Mother's recent drug use. Furthermore, because of Mother's unresolved mental health issues, the Juvenile Court found that Mother's mental or emotional fitness would be detrimental to the Children.

According to the Juvenile Court, Mother never provided safe and stable care for these children or any other child. Mother does not have a meaningful relationship with the Children. Although Mother maintained visitation with the Children, she had not used the visits to cultivate a positive relationship with the Children and, by the time of trial, had not had any contact with either of the Children due to the extreme effects the visits had on them. Mother had not demonstrated an understanding of the Children's basic or specific needs necessary for the Children to thrive, as evidenced by Mother's unresolved issues and her actions during visits with the Children. Mother had not taken what she had learned in her parenting classes and applied it in her visits with the Children but instead made negative comments in front of the Children concerning their respective appearances, gave them

inappropriate gifts, and brought up a deceased infant sibling in a visit with Ralph. These actions by Mother further intensified the Children's behavioral issues and contributed to their trauma. As such, Mother had not demonstrated an ability or commitment to create a home for the Children meeting the Children's basic and specific needs.

The Juvenile Court found that the Children are fearful of Mother when in her presence and have demonstrated no desire to return to her home. The Juvenile Court further found that the Children are fearful of living in Mother's home and that her home likely would exacerbate the Children's post-traumatic stress disorder symptoms. Individuals within Mother's home had engaged in domestic violence and had shown brutality, which the Children had witnessed, and the Children were left damaged from this experience. As the Juvenile Court found, the Children need to have consistency, knowing where they will be laying their heads at night; however, Mother had not demonstrated continuity and stability in meeting the Children's basic material educational, housing, and safety needs due to her unresolved issues.

Due to the trauma the Children experienced while living with Mother, the Children are trauma-bonded and are, therefore, placed in separate foster homes. The Children are very attached to their respective foster mothers. They are each in a loving home where they are cared for and their needs are being met. The Children remain in therapy and take medication due to their PTSD symptoms. Their respective foster mothers want to adopt them, and the Children each have developed a healthy parental attachment with their respective foster mothers. The Juvenile Court found that changing the Children's respective caretakers would be traumatic for them and have a detrimental effect on their emotional, psychological, and medical condition. The record does not preponderate against any of these findings of fact by the Juvenile Court. We find and hold by clear and convincing evidence, as did the Juvenile Court, that termination of Mother's parental rights is in the Children's best interest.

## Conclusion

The judgment of the Juvenile Court terminating the parental rights of Linda M. is affirmed as modified, and this cause is remanded to the Juvenile Court for collection of the costs assessed below. The costs on appeal are assessed against the appellant, Linda M., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE